2023 PA Super 1

| | | |
|---|---|---|
| RICHARD SHELLENBERGER AND PAMELA SHELLENBERGER, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KREIDER FARMS | : | |
| | : | No. 455 EDA 2022 |
| RICHARD SHELLENBERGER AND PAMELA SHELLENBERGER, H/W | : | |
| | : | |
| v. | : | |
| | : | |
| CLARK-RELIANCE CORPORATION, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO JERGUSON GAGE & VALVE COMPANY DURAMETALLIC MANUFACTURING COMPANY FULTON BOILER WORKS, INC. PFIZER, INC., AS THE PARTY RESPONSIBLE FOR THE QUIGLEY COMPANY, INC. ROWLANDS SALES COMPANY, INC. | : | |
| | : | |
| RICHARD SHELLENBERGER AND PAMELA SHELLENBERGER, H/W | : | |
| | : | |
| v. | : | |
| | : | |
| KREIDER DAIRY FARMS, INC., INDIVIDUALLY AND AS SUCCESSOR TO NOAH W. KREIDER, D/B/A KREIDER FARMS, NOAH W. KREIDER AND SONS, AS SUCCESSOR TO KREIDER DAIRY FARMS, INC. AND AS SUCCESSOR TO NOAH W. | : | |

KREIDER, D/B/A KREIDER FARMS,  :
PECORA CORPORATION  :
  :
  :
  :
APPEAL OF: PAMELA K.  :
SHELLENBERGER, EXECUTRIX OF  :
THE ESTATE OF RICHARD M.
SHELLENBERGER, DECEASED, AND
INDIVIDUALLY AS WIDOW IN HER
OWN RIGHT

Appeal from the Order Entered November 27, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  171103049,
181000745, 181100973

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and SULLIVAN, J.

OPINION BY BENDER, P.J.E.:    **FILED JANUARY 4, 2023**

Pamela K. Shellenberger, executrix of the estate of Richard M. Shellenberger, deceased, and individually as widow in her own right ("Appellant"), appeals from the order entered on November 27, 2019, in the Court of Common Pleas of Philadelphia County, which granted summary judgment in favor of the appellees, Kreider Dairy Farms, Inc., individually and as successor to Noah W. Kreider, d/b/a Kreider Farms, and Noah W. Kreider & Sons, LLP, as successor to Kreider Dairy Farms, Inc. and as successor to Noah W. Kreider, d/b/a Kreider Farms (collectively "Kreider Farms" or "Appellees").  After careful consideration, we reverse and remand with instructions.

This appeal arises from an asbestos-related personal injury action commenced by Richard and Pamela Shellenberger, husband and wife, on November 8, 2018, at docket no. 1811-00973, in the Court of Common Pleas

- 2 -

of Philadelphia County, against Appellees, in their capacity as Mr. Shellenberger's employers,[1] and Pecora Corporation ("Pecora"), the manufacturer of an asbestos-containing furnace cement that Mr. Shellenberger worked with while employed by Appellees.[2, 3] The Shellenbergers essentially averred that Mr. Shellenberger developed malignant mesothelioma as a result of his exposure to asbestos while working at Kreider Farms, and alleged negligence on the part of Appellees as a result of, *inter alia*, their failure to warn and protect Mr. Shellenberger from the dangers of asbestos that existed at the worksite. **See** Complaint, 11/8/18, at ¶¶ 6-8, 11-27.[4]

_____

[1] Appellees provide that Noah W. Kreider & Sons, LLP, is a Pennsylvania limited partnership formed in 1956, Kreider Dairy Farms, Inc., is a Pennsylvania corporation formed in May of 1975, and "Kreider Farms" is a trade name. **See** Appellees' Motion for Summary Judgment ("MSJ"), 9/17/19, at Exhibit B ("Certification of Ronald E. Kreider"). Ronald E. Kreider certified that he is a partner of Noah W. Kreider & Sons, LLP, and that he is a shareholder and the current president of Kreider Dairy Farms, Inc. **Id.**

[2] For the purposes of litigation, the trial court consolidated this action with prior related actions commenced by Mr. and Mrs. Shellenberger on November 30, 2017, at docket no. 1711-03049, against Kreider Farms, and on October 5, 2018, at docket no. 1810-00745, against Clark-Reliance Corporation, Durametallic Manufacturing Company, Fulton Boiler Works, Inc., Pfizer, Inc., and Rowlands Sales Company, Inc.

[3] Pecora filed a motion for summary judgment on September 17, 2019, which was denied by the trial court on November 26, 2019. The parties subsequently reached a settlement as to the claims against Pecora. Pecora is not a party to this appeal.

[4] Mr. Shellenberger died on January 21, 2019, after the commencement of this action, leaving Ms. Shellenberger, as executrix of the estate of Richard Shellenberger and in her own right, as the sole plaintiff.

More specifically, the complaint averred the following: As the general manager of dairy plant operations employed by Kreider Farms from 1972 through September 1980, Mr. Shellenberger worked directly with and was proximately exposed to asbestos and/or asbestos-containing products on a regular and frequent basis. *Id.* at ¶¶ 6, 12, 14. Mr. Shellenberger was diagnosed with malignant mesothelioma in May of 2017. *Id.* at 8. Appellees knew or reasonably should have known of the hazardous, dangerous, and harmful conditions created by the asbestos maintained on their property. *Id.* at ¶ 18. Mr. Shellenberger was neither aware nor should have been expected to be aware of such hazardous conditions. *Id.* at ¶ 19. Appellees failed to exercise reasonable care to protect Mr. Shellenberger from the dangers of the asbestos on their property. *Id.* at ¶ 20. Mr. Shellenberger's injuries "were due proximately to the carelessness, recklessness, and negligence" of Appellees. *Id.* at ¶ 21. Said carelessness, recklessness, and negligence consisted of the following:

a. Failing to maintain the premises in a safe manner;

b. Permitting the premises to remain unsafe, hazardous and harmful for any person, including [Mr. Shellenberger], to set upon without sustaining personal injuries;

c. Failing to employ reasonable prudence and care to keep the premises in a safe condition;

d. Failing to protect the rights, safety and position of [Mr. Shellenberger], who was lawfully upon said premises;

e. Failing to properly instruct its agents, servants, workmen and employees;

f. Permitting a dangerous condition to exist;

g.    Failing to inspect and maintain said premises;

h.    Failing to remove and permit to remain hazardous and dangerous conditions on said premises;

i.    Failing to give proper and adequate notice of the dangerous and hazardous conditions on said premises;

j.    Failing to warn [Mr. Shellenberger] of the dangerous conditions of the premises;

k.    Allowing said dangerous and hazardous conditions to exist on said premises for an unreasonable length of time after [Appellees] had knowledge or should and could have had knowledge of the aforesaid conditions;

l.    Violating the applicable laws of the Commonwealth of Pennsylvania;

m.    Otherwise failing to use due care under the circumstances;

n.    Was negligent as a matter of law;

o.    Was otherwise negligent in other ways as shall appear in the course of discovery to be conducted pursuant to the Pennsylvania Rules of Civil Procedure or at the trial of the instant matter.

*Id.* at ¶ 21. Appellees' conduct was a factual cause of Mr. Shellenberger's losses and damages. *Id.* at ¶ 27.[5]

_____

[5] We acknowledge that this action was properly brought against Appellees, pursuant to *Tooey v. AK Steel Corp.*, 81 A.3d 851 (Pa. 2013), in which our Supreme Court determined that claims for an occupational disease which manifests outside of the 300-week period prescribed by Section 301(c)(2) of the Workers' Compensation Act, 77 P.S. §§ 1-104.1; 2501-2626 (the "Act"), do not fall within the purview of the Act and, therefore, the exclusivity provision of Section 303(a) does not apply to preclude an employee from filing a common law claim against an employer. *Id.* at 855. The Court explained:

Employers, like any other entity not covered by the Act, will be subject to traditional tort liability requiring a showing by the plaintiff of, *inter alia*, negligence on the part of the employer, and employers will retain all of their common law defenses. Plaintiffs,

*(Footnote Continued Next Page)*

Mr. Shellenberger was deposed on December 10, 2018, approximately one month before his death. His testimony provides further background and was summarized by the trial court as follows:

[Mr.] Shellenberger testified that[,] in 1972[,] he was approached by Noah Kreider, Jr.[,] about building a dairy processing plant and retail store for the family's farming business. Noah Kreider, Jr. was one of two sons of the business's founder….

Mr. Shellenberger testified that when he began work [*sic*] the dairy processing plant and dairy store did not yet exist — "it was meadow." Mr. Shellenberger was to be the "clerk of the works" who was to "make sure it's built as expected." Mr. Shellenberger "was there during the whole construction of the plant." After the structure was finished in June 1972, Mr. Shellenberger was responsible for managing [the] day-to-day operations of the plant, a position he held throughout the 1970s.

Mr. Shellenberger was asked "whether anyone at Kreider[ Farms] had any specialized knowledge" of operating the milk plant and he answered, "They did not, other than they knew how to produce milk." But Mr. Shellenberger had no experience overseeing a construction project or operating a dairy project either.

Mr. Shellenberger testified that all the equipment for the processing plant was supplied by a company called Rowlands Sales. This includes the plant's boiler that was the alleged source of his exposure to asbestos. Mr. Shellenberger was involved in ordering the equipment for the processing plant. Rowlands Sales made recommendations about products and design for the plant. Mr. Shellenberger believed that Kreider [Farms] was relying on Rowlands Sales for its expertise. Mr. Shellenberger testified that, as general manager, he ordered gauge glass gaskets, handhold

_____

in turn, will bear the higher burden of proof in terms of causation and liability.

***Id.*** at 865. ***See*** Complaint at ¶ 25 (stating that Mr. Shellenberger's injuries accrued more than 300 weeks after his last date of employment with Kreider Farms).

gaskets, sight glass gaskets, clean-out door gaskets, and furnace cement from Rowlands Sales.

Mr. Shellenberger testified that he believed he was exposed to asbestos while working on the boiler at Kreider[ Farms'] dairy processing plant. The boiler required daily, monthly, and semi-monthly maintenance. Every day the boiler had to be "blown down" to remove any scale or "junk" that had collected there. The blow-down process could sometimes cause the boiler's "gauge glass" (used to inspect the boiler's water level) to leak. When this occurred, the gaskets on the gauge glass had to be replaced. The gaskets he used were marked "asbestos." Mr. Shellenberger testified he would have to replace the gaskets "usually weekly" for eight years. Mr. Shellenberger also testified he was exposed to asbestos from the boiler through the removal and installation of handhole gaskets, handling asbestos insulation, and cleaning the sight glass gaskets. Mr. Shellenberger testified that at the time he worked at Kreider [Farms,] he was not concerned about seeing the word "asbestos" on the packaging of the products he used[,] as he did not become aware that asbestos was dangerous until sometime in the mid-to-late 1980s.

Mr. Shellenberger testified that plant safety was part of his duties "[t]o a point. To a very minor point." Noah W. Kreider, Jr. would direct Mr. Shellenberger on some aspects of the work Mr. Shellenberger did, but Mr. Kreider "had very little to say about the boiler room." Mr. Shellenberger admitted that no one at Kreider [Farms] was more knowledgeable than himself about the boiler, its parts, and the cleaning process. Mr. Shellenberger stated he had no facts to support that Mr. Kreider knew the asbestos-containing parts that Mr. Shellenberger worked with were hazardous, although Mr. Shellenberger testified that he expected Mr. Kreider would have known more about the asbestos-containing materials than he did.

Trial Court Opinion ("TCO"), 5/17/22, at 1-5 (citations to record omitted).

On September 17, 2019, Appellees filed a motion for summary judgment, averring that there are no material facts in dispute, that Appellant failed to produce evidence to support her negligence claim against them, and that Appellees are entitled to judgment as a matter of law. *See* MSJ at 6.

Appellees stated there was no evidence that they ever breached any duty to Mr. Shellenberger and emphasized that they had no knowledge regarding the dangers of asbestos during the time Mr. Shellenberger was employed at their dairy processing plant. *Id.* at 5-7. Appellant filed an answer in opposition to Appellees' motion, arguing that Appellees owed Mr. Shellenberger a duty, as his employers, to provide a safe work environment and that, by exposing him to asbestos, when they knew or should have known that it posed a danger to his health, Appellees breached that duty. Answer to MSJ, 10/4/19, at 1-2. Appellant argued that Appellees were not entitled to summary judgment as a matter of law, as she adduced sufficient facts and evidence to establish a *prima facie* case of negligence against them. Moreover, she attached Mr. Shellenberger's deposition transcript and additional documents to her response that she claims raise genuine issues of material fact, precluding the entry of summary judgment. *Id.* On November 27, 2019, the trial court entered an order granting Appellees' request for summary judgment and dismissing all claims and cross-claims against Appellees with prejudice. Appellant filed a timely motion for reconsideration of the order, which the trial court denied on December 9, 2019.

On February 10, 2022, Appellant filed a timely notice of appeal,[6] followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of

_____

[6] We deem Appellant's notice of appeal from the November 27, 2019 order to be timely, as the order did not become final and appealable until January 14,
*(Footnote Continued Next Page)*

- 8 -

matters complained of on appeal. The trial court filed its Rule 1925(a) opinion on May 17, 2022. Appellant now presents the following issue for our review:

> When the evidence is viewed in accordance with the applicable standards, did the trial court err in granting [Appellees'] motion where … the trial court's order was directly contrary to: (a) the evidence presented by way of both [Appellees'] motion and [Appellant's] opposition to motion for summary judgment…; (b) the law governing the duty that [Appellees] — as a matter of law — owed to Richard Shellenberger as a Kreider [Farms] employee; and (c) the legal standard governing the consideration of motions for summary judgment?

Appellant's Brief at 7 (cleaned up).

Our standard of review of an order granting summary judgment is well-settled:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no material fact and it is clear that the moving party is entitled to judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

---

2022, upon the trial court's entry of an order declaring the case settled as to all non-bankrupt parties, with the exception of the dismissal of one defendant without prejudice to be reopened as an arbitration matter. *See Quinn v. Bupp*, 955 A.2d 1014, 1020 (Pa. Super. 2008) ("[I]nterlocutory orders that are not subject to immediate appeal as of right … become reviewable on appeal upon the trial court's entry of a final order."); *Harahan v. AC & S, Inc.*, 816 A.2d 296, 297 (Pa. Super. 2003) ("A trial court order declaring a case settled as to all remaining parties renders prior grants of summary judgment final for [Pa.R.A.P.] 341 purposes, even if the prior orders entered disposed of fewer than all claims against all parties.") (citation omitted).

***Siciliano v. Mueller***, 149 A.3d 863, 864 (Pa. Super. 2016) (citation omitted).

Moreover, we recognize that:

"Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment." ***Babb v. Ctr. Cmty. Hosp.***, 47 A.3d 1214, 1223 (Pa. Super. 2012) (citation omitted), *appeal denied*, … 65 A.3d 412 ([Pa.] 2013).  Further, "failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." ***Id.***

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder.  If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

***Id.***[ ( ]quoting ***Reeser v. NGK N. Am., Inc.***, 14 A.3d 896, 898 (Pa. Super. 2011) (citations omitted)[)].

***Truax v. Roulhac***, 126 A.3d 991, 997 (Pa. Super. 2015).

Instantly, Appellant claims that the trial court erred in granting summary judgment in favor of Appellees, as sufficient evidence has been presented to establish a *prima facie* case of negligence.  It is well-settled that in order to establish a viable cause of action for negligence, the plaintiff must demonstrate the following four elements:

(1) a duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risks; (2) failure on the part of the defendant to conform to that standard of conduct, *i.e.,* a breach of duty; (3) a reasonably close causal connection between the breach of duty and the injury sustained; and (4) actual loss or damages that result from the breach.

***Gutteridge v. A.P. Green Services, Inc.***, 804 A.2d 643, 654 (Pa. Super. 2002) (citation omitted). Thus, the mere fact that a party was injured is not enough to entitle that person to damages. "A plaintiff must show that a defendant owed a duty of care, and that this duty was breached. Indeed, the issue of whether the defendant owed a duty of care to the plaintiff is the primary question in a negligence suit." ***Id.*** at 655.

In support of her argument, Appellant avers that she proffered sufficient legal authority and factual evidence to establish the following: Appellees owed Mr. Shellenberger a duty to provide him with a safe working environment; Appellees breached that duty by exposing him on a regular, frequent, and proximate basis, to asbestos-laden dust created by the daily, monthly, and semi-annual maintenance work that Mr. Shellenberger was required to perform on the boiler at the dairy processing plant; Appellees knew Mr. Shellenberger was working with asbestos-containing boiler components; Appellees should have known, with the exercise of reasonable care, that exposure to asbestos presented a significant risk to the health and safety of exposed workers; and as a direct and proximate result of Appellees' exposing Mr. Shellenberger to the asbestos-laden dust, Mr. Shellenberger developed — and ultimately died from — asbestos-related malignant mesothelioma. Appellant's Brief at 52-53.

Appellees counter that summary judgment was proper because: Appellees hired Mr. Shellenberger to oversee the construction of the dairy processing plant, as they lacked such experience; Appellees relied upon

suppliers to make recommendations on the necessary components to run the dairy processing plant; Mr. Shellenberger ordered many parts and supplies for the dairy processing plant; Mr. Shellenberger was in charge of safety at the dairy processing plant; Appellees had very little to say about the boiler room; Appellees had a good track record for safety; Mr. Shellenberger was not concerned about the word "asbestos" on packaging; Mr. Shellenberger did not become aware of the dangers of asbestos until the late 1980s; no one was more knowledgeable about the boiler, its parts, and the cleaning process than Mr. Shellenberger; and Mr. Shellenberger had no facts to support that Appellees knew the asbestos-containing parts of the boiler were hazardous. Appellees' Brief at 17-18.[7]

_____

[7] While Appellees' argument focuses on their lack of experience in the dairy processing industry and their lack of knowledge regarding the dangers of asbestos, we note that they also raised in a footnote the defense that Kreider Dairy Farms, Inc. owed no duty to Mr. Shellenberger, as there is no proof that Kreider Dairy Farms, Inc. ever employed him. *See id.* at 13 n.1. Appellees suggest, rather, that Mr. Shellenberger would have been employed only by Noah W. Kreider & Sons, LLP. *Id.* at 5. *Contra* Appellant's Brief at 9 n.1 (indicating that Mr. Shellenberger was employed by Kreider Dairy Farms, Inc. during the relevant period of 1975 to 1980). We therefore deem the issue regarding if and when Kreider Dairy Farms, Inc. employed Mr. Shellenberger to be a disputed issue of material fact for the fact-finder to decide. For our purposes of reviewing the trial court's granting of summary judgment, we view the record in the light most favorable to Appellant. *Siciliano*, 149 A.3d at 864. Instantly, Appellant produced certified records from the Social Security Administration, which indicate Mr. Shellenberger's employer as "Noah W. Kreider" from 1972 to 1975, "Kreider Dairy Farms, Inc." from 1975 to 1983, and "Noah W. Kreider & Sons, LLP" from 1983 to 1999. *See* Answer to MSJ at Exhibit A ("Statement of Earnings"); Appellant's Reply Brief at 16 n.2. Hence, we conclude that Appellant met her burden of establishing each of Appellees' status as Mr. Shellenberger's employers with sufficient evidence to survive a motion for summary judgment. *Truax*, 126 A.3d at 997.

The trial court agreed with Appellees and granted their motion for summary judgment. In support of its decision, the trial court stated that Appellant's claims "fail as a matter of law owing to the unique circumstances of this case." TCO at 7. The court reasoned:

> Under traditional negligence principles, it cannot be maintained that [Appellees] acted unreasonably in failing to warn Mr. Shellenberger of the dangers of asbestos. The evidence plainly showed that Mr. Shellenberger was hired both to build and manage the dairy processing plant. This included the boiler that Mr. Shellenberger was responsible for servicing and maintaining. There was no evidence that [Appellees] possessed any knowledge of the dangers of asbestos. No binding appellate authority exists to justify the imposition on [Appellees] of a higher duty to discover this danger for the purposes of protecting [their] employee[,] to prevent him [from] installing a boiler with asbestos-containing products[,] or to warn him of the need to take additional precautions if he did.
>
> Even if the duty to provide a safe workplace is "nondelegable," as Ms. Shellenberger urges, it would stretch the concept of negligence too far to say that [Appellees] violated a duty to Mr. Shellenberger. The workplace provided to Mr. Shellenberger was, according to his own testimony, a "meadow" on which he was tasked with building a dairy processing plant. There is no evidence that either party was aware of the dangers posed by asbestos, and it would not further any policy of the law to select [Appellees] to bear the costs of Ms. Shellenberger's alleged asbestos exposure.

*Id.* at 8 (citations to record omitted).

Based on the foregoing, it is clear that in reaching its decision, the trial court held Appellees to a standard of conduct which imposed on them only a duty to protect their employees from known dangers. Whereas the crux of Appellant's argument is that, as employers and landowners, Appellees owed Mr. Shellenberger a heightened duty of care to not only protect him from

- 13 -

known dangers, but also from dangers that could have been discovered with reasonable care. Hence, it is essential that we determine whether the trial court applied the appropriate standard in this matter.

At common law, "[t]he standard of care a possessor of land owes to one who enters upon the land depends upon whether the latter is a trespasser, licensee, or invitee." **Gutteridge**, 804 A.2d at 655 (citing **Emge v. Hagosky**, 712 A.2d 315, 317 (Pa. Super. 1998)).[8] Pennsylvania law defines "invitee" as follows:

> (1) An invitee is either a public invitee or a business visitor.
>
> (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
>
> (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land.

**Id.** at 655-56 (quoting **Updyke v. BP Oil Co.**, 717 A.2d 546, 549 (Pa. Super. 1998)).[9]

> **The duty of care owed to a business invitee (or business visitor) is the highest duty owed to any entrant upon land. The landowner must protect an invitee not only against known dangers, but also against those which might be**

---

[8] As neither party asserts that Mr. Shellenberger was a trespasser or licensee and Appellant's theory of negligence is predicated on his status as an "invitee" or "business visitor," we need not delve into the definitions of a trespasser and/or a licensee.

[9] Our law uses the terms "business visitor" and "business invitee" almost synonymously. **Id.** at 656.

**discovered with reasonable care.** Our case law sets forth the duty that a possessor of land owes to business invitees as follows:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Id.* at 656 (quoting **Summer v. Giant Food Stores, Inc.**, 743 A.2d 498, 506 (Pa. Super. 1999) (*en banc*) (internal citations omitted; emphasis added)). "With respect to the employer/employee or master/servant relationship, a servant, whether an industrial employee or a domestic servant, is a business visitor at common law." **Geier v. Board of Public Education of the School District of Pittsburgh**, 153 A.3d 1189, 1199 (Pa. Cmwlth. 2017) (citing Restatement (Second) of Torts § 332 cmt. *j*. (1965)).[10] "If the invitee is an

---

[10] We recognize that "a decision of the Commonwealth Court is not binding precedent upon this Court; however, it may be considered for its persuasive value." **Holland ex rel. Holland v. Marcy**, 817 A.2d 1082, 1083 n.1 (Pa. Super. 2002) (citation omitted). Moreover, we agree with the trial court that the decision in **Geier** is apposite here, as **Geier** similarly involved a negligence action brought by an employee and her husband against her former employer, alleging injury from exposure to asbestos dust during her time of employment. **See** TCO at 7 (citing **Geier**, 153 A.3d at 1194). In discussing the duty owed by the former employer to its employee, the Court determined that under common law, the employee "would have been entitled to the protections afforded a business invitee while on the [employer's] premises[.]" **Geier**, 153 A.3d at 1200.

industrial employee, the purpose of his entry is directly connected with the business which the possessor conducts upon the land." *Id.*

Additionally, Chapter 14 of the Restatement (Second) of Agency sets forth the rules which determine the liability of a master to a servant, or an employer to an employee. "In creating and maintaining the conditions of employment, the master has a duty to his servants to have precautions taken which reasonable care, intelligence and regard for the safety of his servants require." Restatement (Second) of Agency § 493 (1958). Comment *a* to Section 493 states in part:

> In creating the conditions under which his servants are to work, the master must conform to the conduct of the ordinary[,] prudent person having the special knowledge which, as stated in Section 495, the employer is required to have. The employer is not an insurer. The precautions he is required to take vary with the dangers of the enterprise in which his servants are engaged. Thus, in a simple business not involving substantial likelihood of harm, the precautions required are correspondingly small. **Insofar as the work is conducted on his premises, his duties to his employees are, in most cases, substantially the same as those of a landowner to any business visitor**.

Restatement (Second) of Agency, § 493 cmt. *a* (1958) (emphasis added).

Moreover, "[a] master is subject to a duty to his servants to conduct his business in the light of knowledge which he has, **and of such knowledge as to the conditions likely to harm his servants as persons experienced in the business and having special acquaintance with the subject matter have**." Restatement (Second) of Agency § 495 (1958) (emphasis added). As explained in the comments to Section 495:

Ordinarily, a servant has reason to believe that his employer is himself an expert or has employed experts who have the special knowledge requisite to create safe conditions of employment, including the maintaining of safe structures, the supplying of proper instrumentalities, the orderly arrangement of the business, and the other matters as to which the employer has special duties to his servants. If the servant so believes, the master is subject to liability unless his plant, equipment, and methods are reasonably safe in view of what is generally known by experts in his business.

***

**The knowledge which is required of an employer includes a knowledge of generally known scientific discoveries** and inventions **applicable to conditions of safety in his business. He is required to inform himself of current advances and of the progress in industries of the same nature as his own**…. He is also under a duty to realize the limits of knowledge of those whom he employs, so that he can guard them against dangers which he is required to know, but of which he should know they may[]be unaware.

*Id.* at cmt. *a*, *c* (emphasis added).

Regarding notice to a master or employer of dangerous conditions,

Section 496 provides:

For the purpose of determining whether or not due care has been used in the performance of the non-delegable duties of the master to his servants, the master has notice of facts affecting the safety of his servants if notice of such facts comes to him, or to a servant or other person whose duty it is to act upon them in the performance of the master's duty to protect his servants.

Restatement (Second) of Agency § 496 (1958). Under Section 496, "[**a**]

**master has a duty to take care to ascertain facts which would indicate**

**danger to his servants, and to take action upon them, if discovered**."

*Id.* at cmt. *a* (emphasis added). "Likewise, if he ascertains facts which

indicate danger, although he was under no antecedent duty to ascertain them,

- 17 -

or even though the exercise of due care would not necessarily have ascertained them, he is under a duty to take suitable action." ***Id.***

Applying the foregoing principles, we agree with Appellant that Appellees must be held to a heightened duty of care. As employers, Appellees owed their employees, including Mr. Shellenberger, a duty to protect them not only from known dangers, but also from those which might be discovered with reasonable care. ***See Gutteridge***, 804 A.2d at 656; ***Geier***, 153 A.3d at 1199; Restatement (Second) of Torts § 332 cmt. *j.* (1965). Moreover, Appellees had a duty to their employees to create and maintain a safe work environment, conforming to the conduct of an ordinary, prudent person who has special knowledge as a person experienced in the business. ***See*** Restatement (Second) of Agency §§ 493; 493 cmt. *a.*; 495 (1958). This includes taking steps to protect their employees from conditions likely to cause them harm. ***See id.*** at § 495. Additionally, Appellees were required to have knowledge of generally known scientific discoveries, to take care to ascertain facts which would indicate danger to their employees, and to take appropriate action if discovered. ***See id.*** at §§ 495 cmt. *c.*; 496 cmt. *a.*

While the trial court seemingly adopted the appropriate, heightened standard of care for determining the duty owed by Appellees in this matter,[11]

---

[11] ***See*** TCO at 7 (citing ***Geier***, 153 A.3d at 1200 (acknowledging that the employee is a business invitee as defined in ***Gutteridge*** and, thus, owed a duty to be protected not only against known dangers, but also against those dangers that might be discovered with reasonable care)); ***id.*** (quoting ***Geier***, *(Footnote Continued Next Page)*

we discern that it erred in its application of this standard. Rather than determining whether the record contained any evidence to support Appellant's claim that Appellees should have known of the hazardous conditions created by the asbestos-containing boiler parts, the trial court considered only whether Appellant had established that Appellees had actual knowledge of the hazards of asbestos. **See id.** at 7-8 (holding that Appellant's claims fail as a matter of law and reasoning that "[t]here was no evidence that Kreider [Farms] possessed any knowledge of the dangers of asbestos"). This was a clear error of law.

Having determined that Appellees, as a matter of law, owed a heightened duty to exercise reasonable care to protect Mr. Shellenberger from the hazards of asbestos contained on the worksite, the relevant question then becomes whether Appellees knew or should have known of such hazards. We agree with the trial court that the record is lacking evidence to prove that, during the relevant time period of Mr. Shellenberger's exposure, Appellees had actual knowledge that asbestos posed a danger to their employees' health. However, we believe the record before the trial court contained sufficient evidence from which a jury could have concluded that Appellees **should have known** of the dangers of asbestos.

---

154 A.3d at 1204 (stating "an employer is charged with such knowledge as to the conditions likely to harm its servants as persons experienced in the business and having special acquaintance with the subject matter have")).

Appellant presented evidence in the form of expert reports, as well as medical journals and publications from the Pennsylvania Department of Labor and the Pennsylvania Department of Health, establishing that the dangers of asbestos were generally known in the 1960s. For instance, Appellant produced an expert report prepared by Gerald E. Markowitz, Ph.D., and David Rosner, Ph.D., in which they conducted a historical review of the relevant medical, scientific, and industrial literature, as well as other publicly available information, to determine, *inter alia*, when it was known and therefore knowable that breathing dust containing asbestos could cause cancer. Answer to MSJ at Exhibit M ("Expert Report"). Markowitz and Rosner concluded that, beginning in the 1930s, there was a suspected link between breathing asbestos dust and cancer, and that the link was acknowledged by many medical researchers by the mid-1940s. ***See*** Expert Report at 4. By the early 1960s, they reported that the range of diseases and cancers associated with asbestos exposure, including mesothelioma, were widely acknowledged and documented. ***Id.*** at 5. ***See also*** Answer to MSJ at Exhibit N ("Report of Barry I. Castleman, Sc.D.") (discussing the known risks to individuals who were exposed to asbestos dating back to the 1940s); ***Id.*** at Exhibit P ("Chronological List of Relevant Articles") (providing summaries of numerous publications, ranging from 1918 through 1978, regarding asbestos and its link to cancer); ***Id.*** at Exhibit R & S ("Special Bulletins") (Pennsylvania Department of Labor's special bulletins nos. 37 and 42, published in 1934 and 1935, respectively, regarding "asbestosis"); ***Id.*** at Exhibit T ("Act No. 552")

(reflecting the Pennsylvania Occupational Disease Compensation Act, 77 Pa.C.S. § 1101 *et seq.*, effective January 1, 1938, which supplemented the Workers' Compensation Act by including occupational diseases, such as asbestosis, within the scope of the Act). In July 1964, the Pennsylvania Department of Health's Occupational Division issued a hygienic information guide regarding asbestos, in which it noted the growing accumulation of evidence that exposure to asbestos fibers may cause cancer of the lung, *see id.* at Exhibit X ("Hygienic Information Guide No. 7"), and in the fall of 1965, it warned of the link to lung cancer and mesothelioma from occupational exposure to airborne asbestos dust. *See id.* at Exhibit Y ("News & Views").

Significantly, Appellant also pointed out that in June 1972, the same month that Kreider Farms' dairy processing plant began operating, the Occupational Safety and Health Administration ("OSHA") enacted its regulations regarding workplace exposures to asbestos. Appellant's Brief at 45 (citing Answer to MSJ at Exhibit BB ("Standard for Exposure to Asbestos Dust")). These regulations required employers, within six months of their publication, to begin monitoring any place of employment where asbestos fibers were released to determine if each of its employee's exposure to asbestos fibers was below the allowable limit. *Id.* at 45-46. The regulations further established methods of compliance, including the adoption of safer work practices, the provision of personal protection equipment and changing rooms, posting caution signs in areas where airborne concentrations of asbestos fibers may exceed the permissible exposure limits, and imposing

restrictions on the disposal of asbestos waste. *Id.* at 46-47. Appellant asserts that despite these federally mandated requirements, Appellees failed to monitor the asbestos levels at the plant and failed to implement any procedures to protect their employees from exposure to asbestos. *Id.* at 68-69.

We believe the foregoing evidence viewed in a light most favorable to Appellant would enable a reasonable jury to conclude that Appellees **should have known** of the dangers of asbestos and the risk that the asbestos-containing boiler components posed to Mr. Shellenberger's health, and that Appellees therefore had a duty to exercise reasonable care to protect him from said hazardous conditions. Thus, the trial court should not have decided this issue as a matter of law. *See Gutteridge*, 804 A.2d at 660 (concluding that summary judgment was not appropriate where the plaintiff averred facts sufficient to create a material dispute as to whether the defendant landowner had superior knowledge concerning the hazards posed by invisible asbestos contamination and, thus, breached its duty to the plaintiff, a business invitee).

Moreover, while "[t]he existence of a duty is a question of law for the court to decide[,[12]] … the determination of whether an act or failure to act

---

[12] *See* Restatement (Second) of Torts § 328B (1965) (providing, in relevant part, that "[i]n an action for negligence the court determines: (a) whether the evidence as to the facts makes an issue upon which the jury may reasonably find the existence or non-existence of such facts; (b) whether such facts give rise to any legal duty on the part of the defendant; (c) the standard of conduct required of the defendant by his legal duty").

constitutes negligence … in view of all the evidence has always been particularly committed to a determination by a jury." ***Straw v. Fair***, 187 A.3d 966, 983 (Pa. Super. 2018) (citing ***R.W. v. Manzek***, 888 A.2d 740, 76 (Pa. 2005); ***Snead v. SPCA***, 929 A.2d 1169, 1183 (Pa. Super. 2007)).[13]  Thus, the trial court erred in determining that Appellees' failure to warn Mr. Shellenberger of the dangers of asbestos did not constitute negligence.  ***See*** TCO at 8 ("Under traditional negligence principles, it cannot be maintained that [Appellees] acted unreasonably in failing to warn Mr. Shellenberger of the dangers of asbestos.").   We believe that Appellant presented sufficient evidence to establish a genuine issue of material fact that Appellees' failure to protect Mr. Shellenberger from exposure to asbestos constituted a breach of the duty they owed him as their employee.  Accordingly, this issue should have been submitted to the jury, and we conclude that summary judgment was inappropriate.

Finally, we disagree with the trial court's statement that "it would not further any policy of the law to select [Appellees] to bear the costs of Mr. Shellenberger's alleged asbestos exposure."  TCO at 8.  To the contrary, this Commonwealth has a well-established, long-standing public policy of recognizing that the responsibility for workplace safety rests with the employer.  ***See Tooey***, 81 A.3d at 857 (recognizing the Commonwealth's

---

[13] "It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence." ***Snead***, 929 A.2d at 1183 (citations omitted).

adoption of the Pennsylvania Workers' Compensation Act, which "was designed to compensate claimants for earnings loss occasioned by work-related injuries"); ***City of Erie v. W.C.A.B. (Annuziata)***, 838 A.2d 598, 601 (Pa. 2003) ("The goal of the workers' compensation legislative scheme is to relieve the employee from the economic consequences of his injury and make those consequences a part of the cost of operation of business, to be paid ultimately by the consuming public.") (internal quotation marks and brackets omitted); ***Ross v. Walker***, 21 A. 157, 158 (Pa. 1891) ("It is the duty of an employer to provide his laborers with a suitable place to work, with suitable tools and machinery to use, with suitable materials….").

Accordingly, we reverse the trial court's November 27, 2019 order granting summary judgment in favor of Appellees and remand this matter for further proceedings consistent with this opinion.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/04/2023